IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                                PLAINTIFF

v.                          No. 4:11-cr-34-DPM

BRANDY MARIE THOMAS                                      DEFENDANT

ORDER

1. The Court has concluded that it needs to rule on the various disputes about the advisory Guideline calculation while the evidence from the 27 January 2014 hearing is fresh. The Court has applied the preponderance standard and has considered all material things from the filings of record, the pre-trial proceedings, the trial, and the recent hearing.

2. **Loss Amount.** The Court has applied USSG §2B1.1(b)(1) and Application Note 3(A)(i) to capture a reasonable estimate, Application Note 3(C), of actual losses that resulted from the offense. The intended-loss issues drop out, because the Guideline requires use of whichever amount is greater, actual loss or intended loss. Whether Thomas intended to repay, therefore,

does not help her here. The Court adopts the chart in the USA's hearing exhibit A as modified.

| Property | Actual Loss |
|---|---|
| Summit | $114,196.97 |
| West 12th | $59,404.66 |
| Glasgow | $120,456.19 |
| Princeton | $33,635.06 |
| Arch | Not Attributable |
| Lakeland | $0 |
| Total Actual Loss | $327,692.88 |

The foundational bank documents secured by Agent Seale are sufficiently reliable, albeit incomplete in places, to calculate the losses. USSG §6A1.3(a). The Court overrules Thomas's continuing objection to these bank records. Interest and foreclosure-related fees have now been excluded, as they should have been.

The Court's decision about the Arch Street transaction involving Hampton needs explaining.

First, the USA's proposed number for Arch-related losses, $146.432.80, is correct. Freddie Mac is not entitled to the $56,123.19 it received in insurance proceeds; but the insurer suffered an actual loss. The lack of a demand for repayment does not change the fact that a loss occurred. If the Arch-related losses could be attributed to Thomas, the insurer's name could easily be determined and restitution to that company ordered.

Second, a preponderance of the evidence, though, does not support attributing Arch-related losses to Thomas. Hampton's testimony that Thomas told her to fake the rental agreements is essential to the USA's Guidelines argument on this transaction. But the Court does not believe Hampton. She has waffled and told completely different stories to the Grand Jury, to Thomas's former lawyer (Justin Eisele), and to the jury at trial about who suggested the fake agreements. The Court specifically credits Eisele's trial testimony that Hampton told him that someone at the mortgage company made the suggestion to her. While falsifying rental contracts certainly echos Thomas's conduct as to other properties, the Court simply cannot rely on Hampton, a witness whose credibility on this point is zero. Thomas got a big commission on the Arch deal, netting approximately $50,000.00 after

-3-

payments to her broker and giving Hampton $25,000.00 back. But the proof at trial was that all transaction parties knew about, and agreed to, the commission. Perhaps it was so large as to be unconscionable. The circumstances are suspicious. Thomas and Hampton are close: Hampton's son is the father of one of Thomas's children; and Thomas lived with Hampton in California for about a year. But without Hampton's uncredited testimony that Thomas suggested the fake-lease strategy, a preponderance of the evidence does not establish that Arch-related losses resulted from Thomas's conduct.

**3. Relevant Conduct.** The Court confirms its ruling from the bench directing a change in paragraph 4 of the PSR. Paragraphs 5-8 are rejected. They must be rewritten, based on a preponderance of the evidence. They should state:

> 5. An investigation of alleged mortgage fraud by Deionne Michelle Foster a/k/a Dionne Rumph led to the investigation of Thomas. Foster and Thomas were friends. Thomas also acted as a real estate agent for Foster in several home purchases. Foster has a substantial history of fraud-related crimes dating back more than

-4-

a decade. She was indicted and pleaded guilty in 2010 to wire fraud in case No. 4:09-cr-113-BSM. Foster is incarcerated.

6. Thomas was the real estate agent for Foster in her 2007 attempt to buy a home on Lakeland Drive in Cabot, Arkansas. Thomas had the accountant for her former business, Arnett & Associates Realtors, Inc., prepare a 2006 W-2 for submission to the mortgage company working on the Lakeland deal. The W-2 was false. First, it reflected that Foster had earned approximately $175,000.00 in wages from Arnett & Associates in 2006. Thomas had sold Arnett & Associates to Coldwell Banker Advantage in December 2005. There was no evidence that Arnett & Associates continued operating in 2006 or, if it did, that Foster performed any work for the company or Coldwell Banker Advantage. Second, the social security number on the W-2 was not Foster's.

7. A false pay stub was also created by Thomas or Foster or both of them. There are two versions of the pay stub; the addresses for Arnett & Associates vary. The false social security number was also on the pay stub. Either Thomas or Foster or both of them sent

the W-2 and pay stub to the mortgage company working on the Lakeland deal. A person claiming to be human resources manager "Kim Robinson" — someone who apparently did not exist — verified Foster's employment at Arnett & Associates by form and telephone. The verification form was faxed back from an Arnett & Associates fax number.

8. Foster also provided the mortgage company a false social security card containing her name and her grandmother's social security number. A general addendum to the contract on the Lakeland property was faxed to the mortgage company from Coldwell Banker, where Thomas worked. The fax purports to come from Thomas. Who sent it is unclear. The addendum required the seller to "convey" a $25,000.00 decorating allowance at closing. The reasonable inference is that Foster would receive this money or a credit for it. Thomas signed the original contract on Lakeland as an agent, but did not sign the addendum. Someone forged broker Lakesha Crow's signature on the addendum.

The Court believes Orville Adams's testimony about Thomas providing him all the information for the W-2. Thomas was thus involved in creating this false form whether she was involved in getting it in the mortgage company's hands or not. The draft PSR's other information about Foster and Bell and McCuien is immaterial. Thomas's objection to it is sustained.

Dunn's statements to Agent Seale, in so far as they are anchored in the documents, have sufficient indicia of reliability to be considered. They're probably accurate. USSG §6A1.3(a). Thomas's standing objection to the Dunn statements and Dunn-related documents is overruled, unless specifically noted otherwise.

Foster's statements to Agent Seale are unreliable. They are, more likely than not, inaccurate. *Ibid.* Thomas's standing objections to Agent Seale's testimony about those statements are sustained. Foster has been committing various frauds for years. She had every incentive to shift blame to Thomas when speaking to Agent Seale. Foster is in the United States' custody, yet she was not called as a witness at the sentencing hearing and no explanation was offered for her absence. In particular, the Court does not believe the testimony of Foster (through Agent Seale) that Thomas suggested Foster's

fraudulent scheme, that Thomas told Foster she (Thomas) could provide the false social security card, and that Thomas eventually did so. Foster's home-buying fraud predated meeting Thomas. The credit reports indicate prior use by Foster of the social security number. And Foster's many other frauds completely undermine her credibility.

Exactly how the false W-2 and pay stub got to the mortgage company remains murky. The Court need not resolve the murkiness because it makes no legal difference to the sentence: Thomas played a role in creating the W-2 and the pay stub, both of which contained the false social security number, as part of the Lakeland transaction; no more need be determined.

**4.** The parties and the Probation Office shall conform the details about the Summit, West 12th, Glasgow, and Princeton loss amounts to the Court's rulings above. Check the disputed rental amounts against the trial exhibits and revise as needed. Insert the word "draft" before the phrase "2006 tax return prepared by Orville Abrams," when current paragraphs 12 and 13 are revised. The proof at trial was that Thomas never picked up the return from him or filed it. Thomas's objection on this point is sustained. Delete current paragraph 14 about Arch because the Court has found that Hampton's

testimony about Thomas's suggestion was not credible. Revise paragraph 16's chart to conform to the Court's rulings on the loss. Arch should not be included. Lakeland should be.

5. Thomas's objections are mostly overruled on West 12th Street and the insurance proceeds. The Court has corrected the loss amount slightly to conform to the records. Though there has been no foreclosure, as shown in the photographs, the property is derelict and currently uninhabitable. While the costs of repair or demolition, and the value of the lot, are unknown, the remaining note balance is a reasonable estimate of the bank's actual loss. What happened to the fire insurance money stays in: Thomas's keeping the money instead of paying off the note, or sharing with her lender, is a fact about her business dealings that is conduct relevant to her to sentence. Current paragraph 11 should be revised to say that this house was "later significantly damaged by a fire" instead of "destroyed."

6. Thomas's objection to the adjustment for obstructing justice is overruled. USSG §3C1.1. Her failure to appear for plea and arraignment after being summoned; her frivolous filings and notices about being a Moor and not subject to the jurisdiction of the United States; her moving to California,

after a lifetime in central Arkansas, without telling the Court or any federal officer where she was going; her remaining at large until arrested after a traffic violation—all these things impeded the administration of justice. Proceedings in this case were on hold for more than a year because of Thomas's obstruction. Hiding in plain sight in California is still hiding.

7. The specific offense characteristics in paragraph 23 must be adjusted to reflect the reduced loss amount.

8. The Court needs further argument before resolving Thomas's objection to paragraph 24. The enhancement should stay in for now. Is a social security number an "authentication feature" in the circumstances of this case within the meaning of USSG §2B1.1(b)(11)? Counsel should address *United States v. Rodriguez-Cisneros*, 916 F. Supp. 2d 932 (D. Neb. 2013), 18 U.S.C. § 1028(d)(1) and (d)(7), and any other authorities they can locate.

The preponderance of the evidence supports the conclusion that Thomas did not use the actual social security card, which does contain authentication features—the columns, special coloring, and the unique lettering. When the copy of the card came into evidence, Agent Seale was clear that Foster (not Thomas) provided the card and her driver's license to

-10-

the mortgage company. While Agent Seale also said — in passing, if the Court recalls correctly — that Foster *and* Thomas provided the card, the Court concludes that he was referring to the social security number, not the card itself. There is, for example, no fax containing the card from Coldwell Banker to the mortgage company. No social security administration documents about how the card was acquired were offered. Unlike the W-2 and the pay stub, the social security card itself is not securely linked to Thomas. What Thomas did was use the social security number, probably in collaboration with Foster, on the false W-2. Does that conduct trigger this enhancement? Please provide the Court with your best argument, drawing on the Guideline, the incorporated statute, and illuminating cases.

**9.** Thomas's objection to the adjustment for role is overruled. USSG §3B1.3. Having a real estate license put Thomas in a position of trust. That position and related skills were abused in a way that significantly facilitated Foster's attempted purchase of the Lakeland property. Even setting that fact aside, the Court agrees with the United States that Thomas's association with Coldwell Banker, and her using the company's standard leasing documents,

lent an air of legitimacy to the fake leases. This significantly facilitated concealment of Thomas's overstated income from rent.

**10.** Thomas's request for an adjustment for accepting responsibility is denied. USSG §3E1.1. While holding the United States to its burden of proof on the essential elements of wire fraud at trial does not automatically eliminate any later acceptance of adjustment, it weighs heavily against one. USSG §3E1.1, Application Note 2. This was not the rare situation where the constitutionality of a statute was the fighting issue. *Ibid.* The Court commends Thomas for what it believes to be sincere post-trial remorse for her actions. The Court will take this change into account in fixing the sentence. But her change of heart has come too late to trigger this Guideline adjustment. The Court must also weigh here Thomas's obstruction of justice. No exceptional circumstances, which could allow these adjustments simultaneously, are presented by this record. *United States v. Muro,* 357 F.3d 743, 744-45 (8th Cir. 2004)(*per curiam*).

**11.** The safety valve is inapplicable because wire fraud is not among the listed triggering offenses. USSG §5C1.2. To the extent Thomas objects to this analysis, *№ 120 at 1,* the objection is overruled.

**12.** Any other objection not specifically addressed is overruled. The Probation Office should use the current Guidelines in revising the report. The revised PSR should be expedited and circulated by 10 February 2014. Any final objections to the revised PSR must be filed by 20 February 2014. The sentencing hearing will be reconvened on Tuesday, 25 February 2014 at 9:00 a.m. in Courtroom #1A.

So Ordered.

*D.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

31 January 2014